**UNITED STATES, Appellee,**

v.

**Private (E–1) Julius L. GILLESPIE, SSN 283–92–5090, United States Army, Appellant (aka James Gillespie, SSN 241–72–3677).**

**CM 435260.**

U. S. Army Court of Military Review.

23 May 1977.

---

Colonel Robert B. Clarke, JAGC, Lieutenant Colonel John R. Thornock, JAGC, Captain Buren R. Shields, III, JAGC, and Captain Peter V. Train, JAGC, were on the pleadings for appellant.

Lieutenant Colonel John T. Sherwood, Jr., JAGC, and Major Michael B. Kennett, JAGC, were on the pleadings for appellee.

Before JONES, FULTON and FELDER, Appellate Military Judges.

## OPINION OF THE COURT

FELDER, Judge:

The appellant was convicted by general court-martial in a trial by judge alone of fraudulent enlistment, rape and robbery in violation of Articles 83, 120 and 122, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 883, 920 and 922. He now seeks a rehearing before this Court pursuant to Article 66, UCMJ, 10 U.S.C. § 866, on the rape and robbery charges because the victim's pretrial photographic identification of him was conducted in an impermissibly suggestive manner so as to cause irreparable misidentification.

The photographic confrontation was conducted on 24 March 1976 by a civilian detective in Tacoma, Washington. He placed six black and white photographs before the rape and robbery victim. She did not indicate that any of them were of her attacker. The detective showed her a seventh photo-

graph, which was a picture of the appellant. The victim said she felt sick when she saw the face and that, except for the skin tone, it depicted the man that assaulted her. The detective then produced three color photographs of the appellant. The victim positively identified him as her assailant from one of the color photographs.

■ Pretrial corporeal and photographic identifications are recognized as effective aids in criminal law enforcement. The employment of these techniques assists in apprehending offenders and exonerating innocent suspects. Because of dangers inherent in witness identification, both techniques must comply with the same judicial strictures. Generally, the law requires that the procedure used in the identification process be conducted in such a manner as not to improperly influence the witness' selection by focusing attention on a particular participant or photograph. See Foster v. California, 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1968); Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967).

■ An analysis of the identification procedure employed in this case causes us to conclude that it was too suggestive. The manner in which the photographs of the appellant were displayed to the victim and the number of photographs of the appellant shown to her directed special attention to him. The Supreme Court of the United States denounced that sort of practice in Simmons when it stated:

"Even if the police subsequently follow the most correct photographic identification procedures and show him the pictures of a number of individuals without indicating whom they suspect, there is some danger that the witness may make an incorrect identification. This danger will be increased if the police display to the witness only the picture of a single individual who generally resembles the person he saw, or if they show him the pictures of several persons among which the photograph of a single such individual recurs or is in some way emphasized." 390 U.S. at 383, 88 S.Ct. at 971.

That Court also emphasized in Stovall v. Denno, 388 U.S. 293, 303, 87 S.Ct. 1967, 1973, 18 L.Ed.2d 1199 (1967), that "the practice of showing suspects singly to persons for the purpose of identification . . . has been widely condemned."

■ Therefore, we must now evaluate the total circumstances to determine whether there was a very substantial likelihood that the suggestiveness of the photographic viewing increased the chance of irreparable mistaken identification. This is the standard for deciding whether an in-court identification would be admissible in the wake of an impermissible out-of-court identification. Neil v. Biggers, 409 U.S. 188, 198, 199, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); Simmons v. United States, 390 U.S. 377, 383, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); United States v. Quick, 3 M.J. 70 (C.M.A. 1977). Some of the factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation. Neil v. Biggers, supra, 409 U.S. at 199, 200, 93 S.Ct. 375; United States v. Quick, supra, 3 M.J. at 71, 72.

According to the victim's account of the incident, at about 2000 hours on 18 December 1975 she was driving on North Fort Lewis enroute home. The driver of a car following very closely behind her flashed his headlights from dim to bright about a half dozen times. She stopped on the side of the road and opened the window about three inches. The car stopped behind her with four headlights shining. A man wearing fatigues, a field jacket and a pile cap approached her. Although it was a foggy night, the lights from his automobile enabled her to see his full face and front. She could not hear him talking as he stood near her car, so she opened the window a little more. The man reached in the car, grabbed

her hair and unlocked the car door. He entered the car, struck her about the face several times, knocking off her eyeglasses, and threatened to kill her. He drove her car a short distance onto a gravel road and despite her resistance, she was sexually assaulted. Also, her purse and its contents valued about $100.00 were taken.

The victim further testified that she gave to the police a description of the assailant that same night; although she saw his face for only five to seven seconds while he was standing outside her car. She described him as having a round face, large expressive eyes, a military type moustache and medium brown complexion with dark spots on the upper cheeks. The next day the CID put together a composite drawing from her description. She participated in two photographic line-ups conducted by the CID but did not select any pictures as being that of the attacker. These photographic viewings were held before the one conducted by the civilian detective that is the subject of this appeal. The victim stated that despite the latter photographic encounter, her in-court identification of the appellant on 24 June 1976 was based on her observation of him the night of the incident.

Considering the total circumstances, we hold there was little chance that the procedure utilized by the detective led to misidentification of the appellant as the assailant. Although the victim observed his face close up for only a brief period of time, it was apparently sufficient to make an indelible imprint on her mind. In *Coleman v. Alabama,* 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970), it was held that an in-court identification by a witness who got a "fleeting" but "real good look" at his assailant in the headlights of a passing car was admissible. In this case the victim's prior description of the appellant was accurate. Because of the "feeling in my stomach" and "honest reaction" that she felt when she saw the pictures of the appellant, she was absolutely positive of his identity and she never erroneously identified anyone else as her assailant. The appellant in fact has a distinctive mole on his face that the victim remembered with certitude. Addi-

tionally, the victim assured the judge that her trial identification was independent of the suggestive line-up.

The evidence supports the judge's decision that the victim's in-court identification of the appellant was based entirely upon her observation of him at the time of the incident and not induced by the illegal photographic line-up. *See United States v. Wright,* 50 C.M.R. 364 (N.C.M.R.1975); *United States v. Fortune,* 49 C.M.R. 616 (A.C.M.R.1974); *United States v. Clifton,* 49 C.M.R. 852 (A.C.M.R.1974), *pet. denied,* 23 U.S.C.M.A. 618, 49 C.M.R. 889 (1974); *United States v. Smith,* 44 C.M.R. 904 (A.C.M.R. 1971).

The appellant also claims that this Court should order a new review and action because the staff judge advocate included in the review a comment made by him during a post-trial interview that he did not desire restoration to duty. He argues that he was substantially prejudiced because the interview "was not shown to have been preceded by proper rights warnings."

Since this issue involves a matter which was not considered by the trial court, we granted the Government's motion to file as an appellate exhibit an affidavit from the attorney who interviewed the appellant. *United States v. Roberts,* 7 U.S.C.M.A. 322, 22 C.M.R. 112 (1956). That unrebutted affidavit states that the trial defense counsel was present at the interview, save during the time the appellant was questioned concerning his views regarding the adequacy of representation. It also mentions that the appellant was advised that his participation in the interview was not compulsory.

▮ In our opinion, the presence of counsel at the interview and the appellant being made aware of his right to silence were sufficient to protect his interest. *Cf. United States v. Simpson,* 2 M.J. 831 (A.C. M.R.1976). Further, no portion of the review was attacked by the defense although there was the opportunity to do so. *United States v. Goode,* 23 U.S.C.M.A. 367, 50 C.M.R. 1, 1 M.J. 3 (1975).

Even absent the complained of comment in the review, it is unlikely the convening authority would have mitigated the sentence. The appellant served on active duty for approximately fourteen months and was separated with a general discharge. When he returned home, he learned that his brother was an Army deserter. He reenlisted in his brother's name "to secure my brother an honorable discharge." Thus, the conviction for fraudulent enlistment. The appellant's criminal activities extend from the State of New Jersey to the District of Columbia to the State of Washington. He is currently serving 105 years confinement in a penitentiary in Walla Walla, Washington, for two rape convictions and a robbery and grand larceny convictions. These matters were brought to the convening authority's attention by the defense before he acted on the case. Under the circumstances, the approval of the adjudged sentence of a dishonorable discharge, confinement at hard labor for 15 years and total forfeitures was appropriate.*

The findings of guilty and the sentence are affirmed.

Senior Judge JONES and Judge FULTON concur.

---

* When delivery is made to any civil authority of a person undergoing sentence of a court-martial, the delivery, if followed by conviction in a civil tribunal, interrupts the execution of the sentence of the court-martial, and the offender after having answered to the civil authorities for his offense shall, upon the request of competent military authority, be returned to military custody for the completion of his sentence. Article 14, Uniform Code of Military Justice, 10 U.S.C. § 814.